# Supreme Court of Texas

No. 24-0447

The State of Texas and Kyle Madsen in his Official Capacity as Director of Right of Way,

*Petitioners*,

v.

JRJ Pusok Holdings, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

JUSTICE HAWKINS, joined by Justice Sullivan, and by Chief Justice Blacklock except as to Part III(A), dissenting.

Since our State's Founding, our Court has enforced the bedrock principle, known as sovereign immunity, that private citizens may not sue the State to redress private injuries unless the State has given its express permission to be sued. That rule exists for good reason. A private individual's suit against the State is really a suit against all of us as taxpayers. Every dollar the government spends defending a lawsuit or paying a judgment to benefit one individual is a dollar that could have been spent on schools, roads, and public safety to benefit us all.

Some individual claims vindicating certain rights are so important to the fabric of our society that we accept that tradeoff. But reasonable minds can and do disagree about where to draw the line—which is why we insist that the Legislature, not courts, decides when to waive sovereign immunity. In our system of democratic governance, our elected representatives are the only ones authorized to balance the competing interests of individuals seeking redress against the State and the burdens their claims place on the public.

We have long insisted that to be operative, a legislative waiver of sovereign immunity must be unmistakable. It need not be marked by any particular magic words, but it must make unambiguous the Legislature's declaration that a suit against the State may proceed. Anything less risks judicial overreach—the usurpation of the Legislature's exclusive prerogative to decide when private citizens may bring suit against the State and burden us all to redress their private individual grievances.

Today, the Court holds that Chapter 21 of the Property Code waives immunity for repurchase claims. In reaching that decision, the Court acknowledges that the statute contains none of the statutory indicia that traditionally signal the waiver of immunity. It agrees that the statute neither mentions "waiver" nor requires the State's participation—the two hallmarks of immunity waivers. It acknowledges that the statutory scheme would have at least *some* effect without a waiver. Nevertheless, the Court invokes various other considerations—including the constitutional backdrop unique to property interests,

Chapter 21's broader statutory context, and practical concerns—to declare that immunity is waived.

Clear-statement rules exist in large part to obviate the need for these searching multi-factor inquiries. When it comes to immunity waivers, the analytical task should be simple: look for an unambiguous declaration that the State may be sued. Is there such a declaration? If so, then immunity is waived. Otherwise, it is not. That basic heuristic should have made this case easy. This statute lacks an unmistakable waiver of immunity, and so the only permissible answer is that no such waiver exists.

The good news is that the Court's approach today is expressly limited to this particular statutory provision, which is born of unique considerations (including a special constitutional backdrop) and inherently distinct from virtually every other statutory right known to our law. Today's decision thus has no bearing on our sovereign-immunity jurisprudence in any other context. Even still, I cannot join the Court's approach or outcome. Properly understood, the State is immune to this suit. I would reverse the judgment below and render judgment for the State.

I respectfully dissent.

# I

I first review the principles of sovereign immunity that underlie my analysis.

## A

Sovereign immunity is "an established principle of jurisprudence in all civilized nations." *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex.

2006) (quoting *Beers v. Arkansas*, 61 U.S. 527, 529 (1857)). Its origins predate the ratification of the U.S. Constitution. *See* ALEXANDER HAMILTON, THE FEDERALIST NO. 81, at 487 (Clinton Rossiter ed., 1961) ("It is inherent in the nature of [a State's] sovereignty not to be amenable to the suit of an individual *without its consent.*"); *see also* WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 214 (4th ed. 1876) ("[N]o suit or action can be brought against the sovereign, even in civil matters, because no court can have jurisdiction over him."). The U.S. Supreme Court has described "States' immunity from suit" as "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden v. Maine*, 527 U.S. 706, 713 (1999).

Our Court's embrace of sovereign immunity goes back to our State's earliest days. As we recognized in 1847, "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). In the 180 years since, we have ratified this foundational aspect of our sovereignty generation after generation. *See, e.g.*, *Taylor v. Hall*, 9 S.W. 148, 149 (Tex. 1888) ("The state cannot be sued without its consent, either directly or indirectly."); *State v. Isbell*, 94 S.W.2d 423, 424 (Tex. [Comm'n Op.] 1936) ("[A] state cannot be sued without its consent, and then only in the manner, place, and court or courts designated."); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) ("[I]mmunity from suit bars an action against the state unless the state expressly consents to the suit." (citing *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997) and *Mo. Pac. R.R. Co. v. Brownsville Navigation Dist.*,

4

453 S.W.2d 812, 813 (Tex. 1970))); *Nazari v. State*, 561 S.W.3d 495, 500 (Tex. 2018) ("The common-law doctrine of sovereign immunity prohibits suits against the state unless the state consents and waives its immunity." (citing *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017)).

We have adhered to this principle for our entire history for many reasons, two of which bear emphasis here. The first involves the separation of powers—the "preserv[ation] [of] executive and legislative power from judicial encroachment." *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 404 (Tex. 2020) (citing cases). The second implicates public policy. Sovereign immunity "shield[s] the public from the costs and consequences of improvident actions of their governments." *Tooke*, 197 S.W.3d at 332. In this sense, sovereign immunity "protect[s] the public treasury." *Redus*, 602 S.W.3d at 404. After all, when the government is sued, we all collectively, through our government, must expend resources litigating cases and paying judgments to satisfy one individual's grievance. *See Brown & Gay Eng'g v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

Safeguarding the public fisc is an important part of sovereign immunity, but the doctrine has never been limited to that purpose alone. *See Nazari*, 561 S.W.3d at 507-08. The doctrine broadly preserves "the relationship between the legislative and judicial branches of government," irrespective of purely financial concerns. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 97 (Tex. 2012); *Fed. Sign*, 951 S.W.2d at 414-

5

16 (Hecht, J., concurring) (outlining modern political and financial reasons for sovereign immunity).[1]

In light of the important values sovereign immunity protects, our State's judiciary has been particularly careful to ensure that the State has waived its inherent immunity anytime we encounter a suit naming the State as a defendant. And we have insisted time and again that because the decision to waive immunity requires the balancing of competing policy interests, immunity waivers are the prerogative of the Legislature, not courts. Our Legislature, as the branch that decides how to allocate resources and money, is the branch that decides which harms merit a judicial remedy. This Court may not, consistent with the separation of powers, determine which claims waive sovereign immunity and which do not—regardless of how we ourselves might weigh the competing public-policy concerns. *See City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007) ("Th[e] heavy presumption in favor of immunity arises [in part] from separation-of-powers principles."). When we set aside that rule, we usurp power allocated elsewhere and commit our State's resources in ways reserved to the

---

[1] The Court rightly rejects Respondent's argument that this suit against the State of Texas does not implicate sovereign immunity at all because it does not threaten the public fisc. We have long held that "immunity is implicated by any suit that seeks to control governmental action." *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 704 (Tex. 2019). Here, Respondent seeks to "control government action" by forcing a sale of land. Anyway, Respondent's argument fails on its own terms. Its live petition expressly asserts that "Plaintiff is entitled to damages." And it expressly demands the State pays its "reasonable attorneys' fees and costs." Moreover, there is no denying that a suit against the State of Texas requires the expenditure of the resources of the State of Texas, regardless of the relief ultimately awarded.

political branches. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 865 (Tex. 2023) (observing that plaintiffs can overcome immunity "only by demonstrating that the legislature, as the branch of government constitutionally empowered to manage the State's financial affairs, has waived immunity by statute"); *Seay v. Hall*, 677 S.W.2d 19, 25 (Tex. 1984) ("[I]t would be a usurpation of our powers to add language to a law where the legislature has refrained.").

**B**

The State always retains the power to waive its sovereign immunity if and when it so chooses. Relevant here, we have traditionally recognized two paths through which the State can and does forego immunity to suit: legislative pronouncement, and constitutional implication.

**1**

The State's standard path for waiving sovereign immunity is through an unambiguous declaration by the Legislature. As we have explained, the Legislature retains the power to consent to suits, but courts will not give effect to that consent unless it is "clear and unambiguous." *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016) (quoting TEX. GOV'T CODE § 311.034)). Only "express[] consent[]" suffices. *Jones*, 8 S.W.3d at 638.

This test is inflexible. Even when our Court might otherwise be sympathetic to a type of claim or a particular plaintiff, we have declined to find a waiver of immunity when the Legislature has not provided the clear language our precedents require. In *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019), for example, we held that the Michael

7

Morton Act did not waive a county's immunity for a wrongful-termination claim brought by a former prosecutor who was fired after he refused to withhold allegedly exculpatory evidence. However disappointing some might find that result as a matter of policy, we held firm: no express statutory language equals no waiver. *See also Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 693-94 (Tex. 2003) (holding that the Texas Health and Safety Code did not waive sovereign immunity for a wrongful-death claim brought against a hospital on behalf of a patient who committed suicide).

Our jurisprudence is rife with examples of statutes that we declared inadequate for purposes of an immunity waiver. For example, in *Taylor*, we held that a statute providing that "[a] treatment facility . . . is liable" for violating the statute and that "[a] person who has been harmed by a violation may sue" does not waive immunity. *Id.* at 698 (emphases omitted) (quoting TEX. HEALTH & SAFETY CODE § 321.003(a), (b)). In *Texas Department of Transportation v. City of Sunset Valley*, we held that Section 203.058 of the Transportation Code—which provides that "adequate compensation . . . shall be made" when the State's acquisition "deprive[s] the agency of a thing of value"—does not waive immunity. 146 S.W.3d 637, 641 (Tex. 2004) (quoting TEX. TRANSP. CODE § 203.058(a)). We explained that "[n]othing in the plain language of section 203.058 indicates the Legislature intended to waive immunity in situations like the one presented." *Id.* at 642. And in *Tooke*, we held that "sue and [or] be sued," "[im]plead and [or] be impleaded," and other similar phrases, without more, did not waive immunity. 197 S.W.3d at 333-42 (quoting TEX. LOC. GOV'T CODE § 51.075).

What gets the job done? Consider one good example from the same subject matter relevant here—property rights. The Property Rights Act provides that "[s]overeign immunity to suit and liability is waived and abolished to the extent of liability created by this chapter." TEX. GOV'T CODE § 2007.004(a). So does the Texas Tort Claims Act, in nearly identical language. TEX. CIV. PRAC. & REM. CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."). And so does a different provision of the Property Code, which provides that "[t]he state's immunity from suit without consent is abolished with respect to suits brought under this section"—namely, appeals of Comptroller decisions regarding claims for unclaimed property. TEX. PROP. CODE § 74.506(a), (c). Where the Legislature uses such explicit waiver language, "we have had little difficulty recognizing a waiver of immunity from liability." *Taylor*, 106 S.W.3d at 696.

**2**

Our precedents recognize an additional—albeit narrow—path by which the State has surrendered its immunity to certain types of claims. In a line of cases exemplified by *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980), we have recognized that the Takings Clause itself operates as a waiver of immunity for inverse-condemnation claims. I will document that precedent in order to illustrate that this line of cases offers no interpretive force as to the statutory-interpretation question before us today.

Article I, Section 17 of the Texas Constitution provides, in relevant part, that "[n]o person's property shall be taken, damaged, or

destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17(a). By prohibiting takings absent public use and just compensation, our Takings Clause plays a critical role in protecting "the sacred and inviolable rights of private property," a natural right that preexists our government. *See Kelo v. City of New London*, 545 U.S. 469, 505 (2005) (Thomas, J., dissenting) (quoting WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 134-35 (1765)); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977); *see also Steele*, 603 S.W.2d at 789 ("Uncompensated governmental taking of property was unlawful before Magna Carta.").

The text is built around the core injuries "taken, damaged, or destroyed." TEX. CONST. art. I, § 17(a). It ties those injuries to a "public use." *Id.* And most critically, it provides that when a taking, damage, or destruction is perpetrated, the property owner "shall" be entitled to "adequate compensation." *Id.* § 17(a), (d). In that sense, our Takings Clause is foundational but commonplace, mimicking that of the federal Constitution and most of our sister States.[2]

---

[2] U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."); *see also, e.g.*, CONN. CONST. art. I, § 11 ("The property of no person shall be taken for public use, without just compensation therefor."); LA. CONST. art. I, § 4(B)(1) ("Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit."); OKLA. CONST. art. II, § 24 ("Private property shall not be taken or damaged for public use without just compensation."); IOWA CONST. art. I, § 18 ("Private property shall not be taken for public use without just compensation first being made . . . ."); MICH. CONST. art. X, § 2 ("Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law.").

Virtually all of our Takings Clause jurisprudence turns on those core elements that describe a constitutional injury. We have assessed whether a taking was really for a "public use." *See, e.g.*, *Hous. Auth. of City of Dall. v. Higginbotham*, 143 S.W.2d 79, 83-85 (1940); *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 182 (Tex. 2019). We have analyzed whether some regulatory action is really a taking at all. *See, e.g.*, *Westgate, Ltd. v. State*, 843 S.W.2d 448, 453 (Tex. 1992); *City of Baytown v. Schrock*, 645 S.W.3d 174, 180-81 (Tex. 2022). We have considered whether "damage" to property was significant enough to implicate the Takings Clause. *See, e.g.*, *State v. Heal*, 917 S.W.2d 6, 10-11 (Tex. 1996). We have evaluated what constitutes "adequate compensation." *See, e.g.*, *Uselton v. State*, 499 S.W.2d 92, 96-99 (Tex. 1973). These cases are multifaceted, but they share a common theme: each turns on the core constitutional injury expressly identified in the text of the Takings Clause.

While nothing in that text refers to immunity or causes of action, our Court has interpreted the Takings Clause to waive the State's immunity for a certain narrow class of claims that implicate the constitutional injury at the Clause's heart. The rationale is set out most clearly in *Steele*. *See* 603 S.W.2d at 791. There, police officers for the City of Houston destroyed a home while pursuing a criminal suspect. *Id.* at 789. The landowner (and his renters) sued the City to recover costs for the damage to the home and their belongings. *Id.* at 788.

The plaintiffs lacked an "enabling statute" for this claim, which arose not as the result of the condemnation process, but rather from a police action without a formal "transfer of property rights." *Id.* at 790.

11

We nevertheless allowed the claim to proceed. We held that under these circumstances, the Takings Clause "itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use." *Id.* at 791. We specifically tied this waiver of immunity to the constitutional text, noting that the destruction the police inflicted on the home is exactly the injury the Takings Clause describes. We summarized: "It was a claim for the destruction of property, and governmental immunity does not shield the City of Houston." *Id*. In short, the plaintiffs presented a classic *constitutional* injury, and we in turn found a *constitutional* remedy with a *constitutional* waiver.

Various post-*Steele* cases ratified that approach—but only when the government action at issue implicated the Takings Clause's constitutional injury. For example, in *State v. Biggar*, we held that the State's denial of an easement exchange—which caused a decrease in the plaintiffs' land value—resulted in compensable damages that were actionable as an inverse-condemnation claim because "[i]f government is able to use its power as sovereign to adjust the value of 'just compensation,' the constitutional protection is rendered meaningless." 873 S.W.2d 11, 12, 14 (Tex. 1994). In *Town of Flower Mound v. Stafford Estates Limited Partnership*, a town conditioned its approval of a subdivision development on the rebuilding of an asphalt road with concrete. 135 S.W.3d 620, 623-24 (Tex. 2004). The town rejected the developer's request for an exception, and the developer ended up paying nearly $500,000 to rebuild the road. *Id.* at 624. We held that the exaction

imposed by the town constituted a taking for which the developer was entitled to compensation. *Id.* at 645.

Similarly, in *Tarrant Regional Water District v. Gragg*, we held that a regional water district committed a taking when its actions—releasing water through a reservoir's floodgates—caused extensive flooding to the plaintiffs' land. 151 S.W.3d 546, 549-55 (Tex. 2004). In *Texas Department of Transportation v. Self*, we allowed an inverse-condemnation claim to proceed where the State cut down trees on the plaintiffs' property outside the scope of the State's easement and refused to compensate the plaintiffs for the cost of replacing the trees. 690 S.W.3d 12, 17-18, 32 (Tex. 2024). And most recently, in *Commons of Lake Houston, Ltd. v. City of Houston*, we held that a regulatory taking can occur even when the regulation at issue—an ordinance requiring construction two feet above the floodplain—resulted from a valid exercise of police power and was intended to ensure compliance with the National Flood Insurance Program. 711 S.W.3d 666, 681, 684 (Tex. 2025).

All of these cases illustrate the *Steele* principle: when the government denigrates the core prohibition of the Takings Clause and inflicts a constitutional injury, the Constitution itself supplies a cause of action and a remedy. We have declared that there is no need in these situations for the Legislature itself to step in with its own statutory immunity waiver. Whether out of respect for the fundamental rights the Takings Clause protects or to exalt the social contract between government and citizen, our jurisprudence consistently—but narrowly—holds that the Constitution's categorical exclusion of core

takings claims from sovereign immunity has always been limited to just that: the taking, damaging, or destruction of property absent public use or adequate compensation. By contrast, government actions that are merely *adjacent* to or *downstream* of takings are subject to immunity absent express legislative waiver. *See, e.g.*, TEX. GOV'T CODE § 2007.021(a) (authorizing a property owner to bring suit "to determine whether the governmental action . . . results in a taking under this chapter"); *id.* § 2007.004(a) ("Sovereign immunity to suit and liability is waived and abolished to the extent of liability created by this chapter.").

## II

With that backdrop in mind, I now turn to the statute before us. I would hold it does not waive immunity because it lacks the "clear and unambiguous" language necessary to effectuate an immunity waiver. *See Sampson*, 500 S.W.3d at 38. I respectfully disagree with the Court's contrary conclusion.

## A

Section 21.101 of the Property Code provides that a person "is entitled to repurchase [] property" under certain circumstances, and that "[a] district court may determine all issues in any suit regarding the repurchase of a real property interest acquired through eminent domain by the former property owner or the owner's heirs, successors, or assigns." TEX. PROP. CODE § 21.101(a), (c). Additionally, Section 21.003 provides:

> A district court may determine all issues, including the authority to condemn property and the assessment of damages, in any suit:

14

> (1) in which this state, a political subdivision of this state, a person, an association of persons, or a corporation is a party; and
>
> (2) that involves a claim for property or for damages to property occupied by the party under the party's eminent domain authority or for an injunction to prevent the party from entering or using the property under the party's eminent domain authority.

*Id.* § 21.003.

It is immediately obvious that this text lacks two critical ingredients. First, there is no reference to waiver. This is an important omission because when the Legislature wishes to waive immunity, it says so by, for example, labeling the provision "Waiver of Immunity." *E.g.*, TEX. GOV'T CODE § 554.0035; *see also id.* § 2007.004(a) ("Sovereign immunity to suit and liability is waived and abolished to the extent of liability created by this chapter."); TEX. CIV. PRAC. & REM. CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."); TEX. PROP. CODE § 74.506(c) ("The state's immunity from suit without consent is abolished with respect to suits brought under this section."). Second, nothing in the text makes the State a necessary party. True immunity waivers expressly declare that "[t]he state shall be made a party." *E.g.*, TEX. HEALTH & SAFETY CODE § 571.0167(b). This statute says no such thing.

The closest the text comes is a single phrase that refers to a district court "determin[ing] all issues." TEX. PROP. CODE § 21.003. But that is a classic jurisdictional grant, not a waiver of immunity. The "determine all issues" phrase simply confirms that a district court has jurisdiction to decide issues in suits already properly before it—such as, for example, a repurchase suit brought against a private entity that

15

acquired land through eminent domain, *id.* § 21.101(c), or an inverse-condemnation claim, *id.* § 21.003(1); TEX. CONST. art. I, § 17(a). Our precedents have always distinguished between a grant of jurisdiction and a waiver of immunity, and they make clear that the language we see here exemplifies the former. *See, e.g.*, *In re Nestle USA, Inc.*, 359 S.W.3d 207, 212 (Tex. 2012) (holding that the "grant of jurisdiction to this Court" in the Texas Franchise Tax Act "is not a clear and unambiguous waiver of immunity"); *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp*, 283 S.W.3d 838, 843 (Tex. 2009) (explaining that "sue and be sued" language "anticipates the district's involvement in civil proceedings of some nature at some point, but it does not address immunity from suit").[3]

In short, the text is missing the key ingredients we expect to see in an immunity waiver, and the only phrase it does supply addresses something different. We should easily conclude, consistent with our precedents, that Section 21.101 does not waive the State's immunity.

**B**

The Court nevertheless holds that "the State has no immunity from Chapter 21 [repurchase] claims." *Ante* at 26. The Court concedes that the traditional indicia of an immunity waiver are absent. It nevertheless finds a waiver by weaving together three extraneous

---

[3] The Court calls my invocation of *Nestle* "misplaced" because the statutory provision in that case used the word "jurisdiction," whereas Section 21.003 uses the phrase "determine all issues." But Section 21.003 is situated in Subchapter A, which is entitled "Jurisdiction." *Cf.* TEX. GOV'T CODE §§ 311.023(7), .024.

16

considerations: constitutional background, context, and practical concerns. I will unpack each.

**1**

The first thread in the Court's reasoning is the constitutional background of this statutory scheme. While the Court does not (and could not) claim that the Constitution itself waives immunity for statutory repurchase claims, it nevertheless insists that it "cannot ignore Chapter 21's constitutional overlay, requiring that the State take property only for public use." *Ante* at 20. The Court does not specify how much work this consideration is doing. But because the Court gives it at least some weight, I will explain why, in my view, the constitutional background has no meaningful bearing on the particular question before us today.

The injury Respondent identifies—a price difference between current market value and original sale value in connection with the attempted repurchase of land previously sold to the State—is distinct from the type of injuries for which the Takings Clause itself waives immunity, and it does not follow that one informs the other. *See supra* Part I.B.2. Even under Respondent's own telling, the right it seeks to vindicate is a very different concept from the injury at the heart of the Takings Clause and the circumstances our previous precedents have encountered. Respondent's operative petition alleges that the State "refused to comply with Sections 21.101, 21.102, and 21.103 of the Texas Property Code" by not selling the surplus land at the price purchased by the State. Respondent admits the State sent an "offer letter" to purchase its land. The State thereafter initiated condemnation proceedings, but

Respondent later "entered into rule 11 agreements with the State to settle the condemnation." The record confirms that the parties negotiated and agreed upon a sale. Respondent even acknowledges that the State is now willing to sell the "surplus land" back to Respondent. The *sole* injury, according to Respondent, is that the State wants to charge "current market value as opposed to the price paid by the State" in the original sale contract. None of this describes one of the core constitutional injuries the Takings Clause addresses. *See supra* Part I.B.2.[4]

That repurchase claim differs from the Takings Clause not only textually, but also temporally. By design, the repurchase statute comes into play *after* the work of the Takings Clause is complete. The State initiated condemnation proceedings in order to take land for a public use. *See* TEX. PROP. CODE § 21.101(a). Those condemnation proceedings ended in dismissal, after the parties negotiated and agreed to a sale. The landowner received adequate compensation—some $682,000. At that moment, when the check cleared and the deed changed hands, the constitutional process ended. *See City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236 (Tex. 2011) ("[I]t is not the taking of property, as such, that raises constitutional concerns, but the taking of property *without just*

---

[4] The Court points out that the State's offer to sell the property at its current market value aligns with the statute's pre-*Kelo* amendments. *Ante* at 24. That changes nothing: Respondent's suit does not implicate a Takings Clause injury. Moreover, the current version of the statute requires the entity "to sell the property interest to the person for the price paid to the owner by the entity at the time the entity acquired the property through eminent domain." TEX. PROP. CODE § 21.103(b). As I will explain below, Respondent's land was not acquired "through eminent domain."

*compensation.*") (citation omitted); *see also City of San Antonio v. Grandjean*, 41 S.W. 477, 479 (Tex. 1897) (noting that "when a dedication [to public use] is offered and accepted, it is complete, *even before any act is done by the representative of the public, which changes the position for the worse*" (emphasis added)). That sets this claim apart from *Steele* and the other cases discussed above, all of which confronted a constitutional injury identified in the text of the Takings Clause. *See supra* Part I.B.2.

The Court implies that the Takings Clause's "public use" requirement impacts its analysis today, but I do not see why it would. The Takings Clause presents a fixed-in-time requirement—not a permanent constitutional lien on all government property. Even if one could conceive of a negotiated purchase as a taking, the public use inquiry occurs at the moment of the transaction, not indefinitely into the future. Put another way, once a taking is executed for a legitimate public use, the constitutional requirements are satisfied, and the constitutional inquiry ends. A constitutional injury does not spring into being years later when the government's plans change.[5]

Our Court confirmed as much shortly after the Constitution of 1876 was ratified. In 1897, we held that a plaintiff could not reclaim property taken by the State for which she had received compensation. *See Grandjean*, 41 S.W. at 480. In reaching this conclusion, we emphasized that a taking is complete when the transaction is

---

[5] I of course am not addressing the rare situations involving dishonesty, bad faith, or pretext in which the government falsely claims a public use it does not actually intend. Nothing like that is alleged here, and no one has doubted that the State intended in good faith at the moment of acquisition to put Respondent's property to public use.

19

effectuated: "when a dedication [to public use] is offered and accepted, it is complete, *even before any act is done by the representative of the public, which changes the position for the worse.*" *Id.* at 479 (emphasis added). In other words, "[t]he conditional paramount title of the government becomes absolute when the compensation is assessed or agreed upon and paid." *Id.* When a landowner "accepts as compensation a sum of money, whatever the amount, and in whatever manner arrived at, his property, to the extent of the taking, is expropriated and appropriated to the use of the public." *Id.* We confirmed that taken land does not need to be put to public use in perpetuity: for "a public use[] to be effectual," it need not "be evidenced by the use of it having been continued for any particular time." *Id.* (quoting *Oswald v. Grenet*, 22 Tex. 94, 99 (1858)). Rather, "[i]t is enough that there has been some clear, unequivocal act or declaration of the proprietor evidencing an *intention* to set it apart for a public use, and that others have acted in reference to, and upon the faith of, such manifestation of intention." *Id.* (emphasis added).

The interests the Takings Clause's "public use" requirement protects were satisfied and extinguished at the moment of transaction. I would ascribe to it no meaningful interpretive force in deciding whether Chapter 21 contains an express and unambiguous statutory waiver of immunity for repurchase claims long after that transaction concluded.

**2**

The second strand in the Court's analysis is statutory context. The Court zooms out to Chapter 21 writ large: "the Legislature nested the repurchase statute within existing law governing eminent domain—

20

proceedings from which the State enjoys no immunity." *Ante* at 15. In my view, the fact that the Court needs to consider context only proves that the statute lacks the clear and unambiguous waiver our precedents demand.

No one doubts that context can inform meaning. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012). And we have noted that "[a]mong the core contextual considerations that generate reliable constructions are the surrounding provisions of a disputed text and how that text arises within the statute's larger historical sweep." *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (citing READING LAW at 33). But as our decision in *Brown* illustrates, we "proceed to examine the larger statutory context" only *after* concluding that the "plain text" of the particular provision at issue is indeterminate. *Id.* at 752. To resort to context, as the Court does, is to concede that the text lacks the unmistakably clear and unambiguous statement that our precedents demand of an immunity waiver. *See supra* Part I.B.1. This is a sure sign that the actual provision before us provides no clear statement waiving immunity.

Even if we could draw some meaning from context, its interpretive force here would be particularly weak. True, Chapter 21 is nested among provisions about condemnation proceedings, which we have recognized fall outside sovereign immunity. *See Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 188 (Tex. 2023). But condemnation proceedings lack immunity because the State is the plaintiff. Sovereign immunity is a

21

shield against being sued, not a barrier to suing. The absence of immunity in condemnation proceedings tells us nothing about whether immunity has been waived for a separate, subsequent claim brought by a private party *against* the State. *See generally id.* The fact that the Legislature, as a matter of good housekeeping or statutory hygiene, placed the repurchase right near provisions involving eminent domain cannot be read as an unmistakable immunity waiver.

Chapter 21's other provisions prove exactly that. Section 21.0112, for instance, requires a condemning entity to provide a "Landowner's Bill of Rights" to property owners before initiating condemnation. *See* TEX. PROP. CODE § 21.0112. If a state agency fails to provide this document, has immunity been waived for a private suit to enforce compliance? Similarly, Section 21.0111 requires entities with eminent domain authority to prepare certain reports. *See id.* § 21.0111. If TxDOT files an incomplete report, can an injured party sue? And Section 21.023 requires condemning entities to disclose the former owner's repurchase rights in writing at the time of acquisition. *See id.* § 21.023. If TxDOT fails to make this disclosure, has immunity been waived for a suit to enforce the disclosure obligation? The answer to all three of these questions is surely "no," which confirms that mere placement in Chapter 21 cannot provide the "clear and unambiguous" indicator our precedents demand.

Moreover, when the Legislature wishes to waive immunity across an entire statutory chapter, it can and does say so. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished *to the extent of liability created by this chapter*." (emphasis

22

added)). And our precedents reject the wholesale importing of immunity waivers across multiple provisions absent clear instructions. *See Rusk*, 392 S.W.3d at 94 ("The Legislature has waived governmental entities' immunity from certain claims by means of the Tort Claims Act (TCA). But the TCA embodies only limited waivers of sovereign immunity; it does not abolish it." (citations omitted)); *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996) (rejecting a result that "would be tantamount to abolishing governmental immunity, contrary to the limited waiver the Legislature clearly intended"). All this is consistent with the foundational and uncontroversial principle that waivers of immunity must be construed narrowly. TEX. GOV'T CODE § 311.034.

**3**

Finally, the Court invokes practical concerns, claiming that the repurchase statute would "serve[] virtually no purpose absent a waiver of immunity." *Ante* at 18. Of course, the broader logical consistency of a statutory scheme is a relevant consideration in the interpretive task. *See, e.g.*, *Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 6 (Tex. 2000). But here, the repurchase statute makes adequate sense on its own terms absent a waiver of immunity.

First, Section 21.101 still directs governmental conduct, even if it does not provide a back-end option to sue the State when it fails to allow for a repurchase. The State is subject to innumerable statutory commands—procurement rules, environmental regulations, employment standards, records retention requirements—enforceable through internal oversight, legislative appropriations, audits, and political accountability rather than private litigation. *See Redus*, 602

23

S.W.3d at 411 ("Political accountability is a vital counterweight to sovereign immunity[.]"); *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 629 (Tex. 2023) (Boyd, J., dissenting) ("[T]he political process often serves as a substitute for private lawsuits to deter arbitrary and imprudent governmental action."). There is nothing remarkable about our Legislature imposing rules on our government that cannot be enforced through private litigation, and we have held repeatedly that the mere creation of a substantive right does not necessarily waive immunity to enforce it. *See, e.g.*, *Taylor*, 106 S.W.3d at 700, 702 (holding that the Texas Health and Safety Code did not waive sovereign immunity, even though it provided a "meaningful cause of action against private mental health care facilities"); *Sunset Valley*, 146 S.W.3d at 641-44 (holding that a statute did not waive immunity to enforce right to "adequate compensation" found in the Transportation Code).

Second, the repurchase right binds private condemnors who lack sovereign immunity. Railroads, pipelines, electric utilities, and others possess legislatively granted condemnation authority. *See, e.g.*, TEX. TRANSP. CODE § 112.002(b)(5). When these private entities acquire property through eminent domain and later abandon the public use, Section 21 grants former landowners a right to sue, and the condemnors cannot invoke sovereign immunity. We have relied on this exact consideration in the past to declare that a statutory right still carries "meaning" when it is "construed against an asserted waiver of immunity." *Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 759 (Tex. 2011) (citation omitted).

\* \* \*

Today the Court holds that in this particular statutory context, the Legislature waived immunity not by saying "immunity is waived" or "the State is liable" or "the State is a necessary party," but by placing a statutory right in a particular code chapter, granting courts jurisdiction over disputes arising under that right, and using the phrase "may determine all issues." That is no "clear and unambiguous" waiver. I thus would conclude that Chapter 21 does not waive sovereign immunity and end the analysis there.

## III

Even if Chapter 21 waived sovereign immunity, Respondent did not properly invoke that waiver. This property was not acquired "through eminent domain"—the necessary prerequisite for the statutory scheme to take effect. And Respondent sued in the wrong court. I respectfully disagree with the Court's contrary conclusions on each point.

## A

Section 21.101 operates on properties acquired "through eminent domain." TEX. PROP. CODE § 21.101(c). Respondent's property was acquired through a privately negotiated and mutually agreed upon sale, not eminent domain. The State, therefore, does not occupy the land under its "eminent domain authority," the statute's necessary prerequisite. *Id.* § 21.003(2).

Honoring our duty to construe every word in the provision, *see e.g., City of San Antonio v. Realme*, 731 S.W.3d 342, 349-50 (Tex. 2026), we must place due weight on the word "through," which traditionally

means "passage into *and out of* some . . . process." *Through*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002) (emphasis added)). Another dictionary notes that "[p]rimarily *through* expresses the general relations of passage from boundary to opposite boundary of anything, penetration to all parts, continuance to the end of a period . . . . Into, for subjection to some treatment, and then out of[.]" *Through*, WEBSTER'S SECOND NEW INT'L DICTIONARY, UNABRIDGED (1954). Those definitions indicate that for property to be "acquired *through* eminent domain," the eminent domain process must have not only begun—but also concluded.

Here, it would be most natural to say that the State acquired the property at issue "through purchase." True, the condemnation process began. But the negotiated sale is what effectuated the change in the property's legal status. And the Legislature itself treats condemnation and purchase as distinct. The Transportation Code, for instance, authorizes the Texas Transportation Commission to "acquire [an interest in real property] by purchase . . . *or* by the exercise of eminent domain, in the name of the state." *See* TEX. TRANSP. CODE § 203.051(a)(1) (emphasis added). It could have done the same here, but it instead limited the repurchase right to circumstances when eminent domain, not "purchase," does the actual work.

The distinction comports with standard usage, as a simple analogy illustrates. Suppose the State charges a defendant with felony bank robbery. The State gets an indictment and initiates criminal proceedings. The jury is empaneled, and trial starts. The defendant hears the government's first witness—and realizes he is doomed. He

26

asks the court for a recess to work out a plea deal with the prosecutor. The prosecutor offers a misdemeanor, which the defendant accepts, and the court enters a corresponding judgment of conviction. Would any ordinary speaker of English say that the defendant was "convicted through a jury trial"? Of course not. The process started, the jury heard some evidence, and the court rendered judgment. Any ordinary speaker would say that the defendant was "convicted through a plea bargain." The jury in my hypothetical plays much the same role the State's eminent domain power plays in this case—a powerful incentive to settle, but not the legal mechanism that effectuates the end result.

By consenting to the warranty deed, Respondent has effectively conceded that the eminent domain process started but never finished. The document itself expressly states that "[t]he consideration recited herein represents a settlement and compromise by all parties as to the value of the property herein conveyed *in order to avoid ED proceedings* and the added expense of litigation." (emphasis added). Respondent agreed to a sale to *prevent* the very process it now claims occurred. The State did not acquire the land "through" eminent domain—it acquired it through a negotiated purchase. It thus was acting "within a color of right under the contract"—the warranty deed—rather than within its eminent domain powers, and therefore lacked "'the requisite intent under constitutional-takings jurisprudence.'" *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 844 (Tex. 2010) (quoting *Gen. Servs. Comm'n v. Little–Tex Insulation Co. Inc.*, 39 S.W.3d 591, 598-99 (Tex. 2001)).

For these reasons, I would conclude Section 21.101 does not encompass the claim Respondent seeks to assert.[6]

**B**

Irrespective of the above, the State is entitled to judgment because Respondent filed suit in the wrong court. We have always held that immunity waivers may prescribe the form of the waiver, and when the Legislature waives immunity subject to conditions, the failure to strictly adhere to those conditions negates the waiver. *See Nestle*, 359 S.W.3d at 208 ("[S]tatutory prerequisites are conditions on the legislative waiver of the State's immunity from suit."); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) ("[T]he Legislature . . . has consented to suits brought under the TCHRA, *provided the procedures outlined in the statute have been met*." (emphasis added)). That principle forecloses Respondent's suit.

---

[6] The Court asserts in passing that its "approach coheres with" this Court's reasoning in *Texas A&M University-Kingsville v. Lawson*, 87 S.W.3d 518 (Tex. 2002). *Ante* at 19. I do not take this observation to be doing any work. In any event, the plurality decision in *Lawson* carries no relevance here. The plaintiff, a former university faculty member, sued a university for violations of the Whistleblower Act. *Lawson*, 87 S.W.3d at 518. The parties later settled, and the plaintiff sued for breach of the settlement agreement. *Id.* at 519. The university, invoking sovereign immunity, argued the suit was barred. *Id.* This Court held that the university was not immune because "when a governmental entity is exposed to suit because of a waiver of immunity, it cannot nullify that waiver by settling the claim with an agreement on which it cannot be sued." *Id.* at 521. In this case, by contrast, the parties settled the *State's* condemnation lawsuit; sovereign immunity was not implicated in that initial action because the State brought suit as the plaintiff. Moreover, unlike the plaintiff in *Lawson*, Respondent has not alleged that the State breached any contract.

28

The unheeded condition specifies what type of court may hear these suits. Both Section 21.003 and Section 21.101, which provide the statutory hooks for a purported immunity waiver, refer to the "district court." TEX. PROP. CODE §§ 21.003, 21.101(c). The Legislature has proclaimed, in other words, that any immunity waiver that might exist is limited to suits brought in district court. It is entirely reasonable for the Legislature to route these important and complex suits that implicate significant sovereign interests to district courts rather than county courts at law. When a plaintiff tries to override that decision and sue elsewhere, he falls outside the waiver.

Respondent sued in a county court at law, not a district court. *See id.* The waiver does not extend to county courts at law. Respondent did not adhere strictly to the "conditions on the legislative waiver." *Nestle*, 359 S.W.3d at 208. Its claim thus necessarily fails.

Neither the Court nor Respondent offers a plausible solution to this dispositive defect. The Court's analysis is limited to whether, as a matter of the jurisdictional limits in our Constitution's Article V, a county court at law has authority to hear this type of claim. But that assumes the premise that immunity is waived. We need not reach the question of constitutional limits on county courts at law because Respondent did not comply with a prerequisite necessary for the waiver to be effective. *See* TEX. PROP. CODE §§ 21.003, 21.101(c); *Nestle*, 359 S.W.3d at 208. Any legislative waiver is effective only when the plaintiff complies strictly with its terms, including filing in the court the Legislature has identified—an issue unrelated to the abstract question of what types of claims can proceed in a county court at law. Respondent

29

did not comply with the terms of any waiver, and so its claim fails at the outset.

Neither of Respondent's proposed solutions is satisfactory. First, Respondent claims that Sections 21.003 and 21.101(c) use a permissive "may," and thus permit—but do not require—district courts to hear repurchase suits. But the State "cannot be sued without its consent, and then *only in the manner, place, and court or courts designated.*" *Isbell*, 94 S.W.2d at 424 (emphasis added) (citation omitted); *see also City of Madisonville v. Sims*, 620 S.W.3d 375, 379 (Tex. 2020) (explaining that even where a statute waives immunity, "strict compliance with the [statute's] procedural requirements is required to bring a claim"). Even if the repurchase statute "permits" the State to be sued in a district court, the statute does not affirmatively permit such suits to be brought in a county court at law.

Respondent next invokes Government Code Section 25.1032, which grants "[a] county civil court at law in Harris County" "jurisdiction" to "hear a suit for the recovery of real property." TEX. GOV'T CODE § 25.1032(a), (d)(6). But as its text makes obvious, Section 25.1032(d)(6) is a run-of-the-mill jurisdictional grant. *See AIC Mgmt. v. Crews*, 246 S.W.3d 640, 643 (Tex. 2008) (labeling Section 25.1032 as a "jurisdictional grant to statutory county courts in Harris County"). It does not even purport to (much less actually) modify or excuse compliance with the separate provision in which Respondent claims to find a waiver. Indeed, a neighboring provision allows county civil courts at law to "hear a suit to recover damages for slander or defamation of character," TEX. GOV'T CODE § 25.1032(d)(2), but this

30

language obviously does not waive immunity for slander suits brought against the State.

Nor does Property Code Section 21.001—which provides that "[d]istrict courts and county courts at law have concurrent jurisdiction in eminent domain cases"—waive immunity. TEX. PROP. CODE § 21.001. As the Court correctly observes, Section 21.001 is a jurisdictional grant that vests county courts at law with the power to hear "eminent domain cases." *Ante* at 25. However, as with Section 25.1032(d)(6), such jurisdictional grants are not waivers of immunity. *See supra* Part II.A.

For these reasons, I would hold that even if Chapter 21 could be read to waive immunity for repurchase suits, that waiver does not extend to suits—like Respondent's—brought in a county court at law.

IV

I would reverse the judgment below and render judgment for the State. I respectfully dissent.

_____<br>
Kyle D. Hawkins<br>
Justice

**OPINION FILED:** June 12, 2026